Sarah McNerney, as Administratrix of the Estate of Peter McNerney, Also Known as Peter McInerney, Deceased, Respondent, v. New York Polyclinic Hospital, Appellant.

First Department, March 26, 1963.

*George J. Conway* for appellant.

*Douglas A. Witschieben* of counsel (*Dent, Goldblum & Witschieben,* attorneys), for respondent.

BOTEIN, P. J. On October 30, 1956 Peter McNerney, age 66, underwent an operation at the New York Polyclinic Hospital. He died there on November 4, 1956. Asserting that his death was attributable to negligent postoperative treatment on the part of the hospital, his widow, as administratrix, brought this action against it for damages. She recovered judgment after trial before a jury, and the hospital appeals.

The operation was a subtotal gastrectomy for a duodenal ulcer. The medical experts were in accord that for a period of about five days after such an operation nourishment is ordinarily confined to intravenous feeding and slight quantities of water. That no different regimen had been prescribed for the decedent is undisputed. They were also in accord that he died of peritonitis. Plaintiff contended that solid food had been negligently given the decedent by a hospital employee during the afternoon of November 3 and after 4:00 P.M. of that day, and that its ingestion induced the peritonitis. Defendant's position is that the giving of such food was improperly proven and that in any event it was not the cause of the peritonitis.

We consider first the issue of causation. Plaintiff's expert, Dr. Rosenthal, was of opinion that the " cause of death here was acute generalized peritonitis following a disruption of a

duodenal stump following a subtotal gastrectomy '' and that '' the eating of the food as described was the competent producing cause of this condition ''. Explaining that the operation performed on the decedent involved a tenuous closure of tissues '' that might give trouble because of the very nature of this thing '', he also testified that '' the sutures will cut through sometimes * * * without any interference of any kind '', and that the fatal disruption could also be caused by an incorrect repair, by '' a repair of a stump that doesn't have the strength to hold the repair '', by a circulatory disturbance in the wall of the duodenum, by infection, and by overdistention of the stomach by gases or the normal secretion of stomach fluids.

The temperature chart indicated a decline in body temperature from febrile level to subnormal between midnight on November 2 and noon on November 3. This drop, Dr. Rosenthal testified, could mean '' that there is a leakage taking place to a small degree, and finally '', presumably from the ingestion of food, '' it all goes ''. On the other hand, he said, it could also mean that '' the blowing of the stump had already occurred ''. The nurses' notes indicated pronounced abdominal distention at 4:00 P.M. on November 3. In such a case, he explained, the area of the closure is likewise distended, with resultant strain on the stitches, and the introduction of even a small amount of food '' adds insult to injury and can blow that stump.'' There was '' some peritonitis '', he stated, by 4:00 P.M. on November 3, and he timed the '' blowing of the stump '' at some moment on November 3 after the noon hour.

Dr. Lipsey, defendant's expert, emphasizing decedent's age and long history of stomach trouble, expressed the view that decedent '' was on the down grade from the minute he was operated on '' and that the fall in temperature to subnormal indicated a '' massive leakage of the stump at that point, whereas he apparently had some slight leakage before to give him his temperature.''

Neither expert had attended the decedent. Both were attempting precise explication of an obscure occurrence on the basis of data evidently indecisive. Dr. Rosenthal's concession that the disruption may have occurred hours before the food was eaten — a contingency as compatible with the proof as any hypothesis that might support a finding of defendant's negligence — seems in itself to bar application of the rule that plaintiff was '' not required to offer evidence which positively excluded every other possible cause '' (see *Swenson* v. *New York, Albany Despatch Co.,* 309 N. Y. 497, 502). Keeping in mind his

acknowledgment of, as he put it, "the intangibles in these things", as well as the elements of uncertainty and speculation disclosed by his testimony, it seems clear that the verdict contravened the weight of the credible evidence and that a new trial must be directed. Against that event it becomes necessary to consider the competence of the testimony that the decedent had been served solid food.

On the issue of the food plaintiff's chief witness was Rivon West, a practical nurse on duty from 3:00 P.M. on November 3. West did not testify in person; instead his deposition, taken in New York on December 23, 1958, was introduced. The deposition indicated not only that West's assistant, Wheeler, had given the decedent a tray of food from which decedent had eaten milk and cake, but also that Wheeler had acknowledged that the tray had been given by mistake. Defendant's objections to the reading of the deposition were in our opinion well founded.

A deposition such as West's may not be read in evidence "unless it appears to the satisfaction of the court that the deponent is then dead or is out of the state or at a greater distance than one hundred miles from the place where the court is sitting, or that, by reason of insanity, sickness, or other infirmity, or imprisonment, he is unable to travel to and appear at the court, or that for any reason his attendance cannot be compelled by subpœna, with the exercise of reasonable diligence" (Civ. Prac. Act, § 304).

As section 304 implies, the party invoking it must make preliminary proof of circumstances entitling him to its benefit (*Bronner* v. *Frauenthal*, 37 N. Y. 166, 172–173; *Baumeister* v. *Durham Realty Corp.*, 238 App. Div. 424; *Gardner* v. *Bennett*, 6 Jones & Sp. 197, 201–202). Accordingly, plaintiff adduced the testimony of the decedent's son, himself a trial attorney. The son had originally met West five years before the trial at the office of a detective agency, one of whose operators he had used to make contact with West. He had last seen West about two or three months after the taking of West's deposition. At noontime on March 5, 1962, nine days before the trial began, he went to 328 High Street, Newark, New Jersey, the last address of West known to him. He then testified: "I didn't see his name on the letterbox or near any bell. In fact, there were no bells there." He was then asked, "Were you able to find anybody who could tell you where to find him?" Defendant's objection to this question was overruled, but the question was never answered, for immediately after defendant had excepted to the court's ruling the following interrogation appears in the record, and it concludes plaintiff's inquiry into the subject. "Q. Did

you make any attempt to locate him in New York State? "A. I checked the telephone books for all the boroughs of New York City, also Nassau, Suffolk and Westchester, under his name. I could not find his name." Reception of the deposition on the basis of such scanty proof was error, particularly in view of the unsatisfactorily explained circumstance that West's deposition was unsigned, as next discussed.

Well taken, too, was defendant's additional objection that the deposition lacked West's signature. The required reading and signature of the completed deposition (Civ. Prac. Act, § 302) tend to insure its " truthfulness and authenticity " (see *Anna McNally, Inc.* v. *Chapin,* 197 App. Div. 792, 797), a purpose only partly served by proof of accurate stenography. While section 302 provides that subscription may " in the discretion of the court be waived for good cause shown ", the court should have before it all available facts conducive to sound exercise of discretion. In the present case the decedent's son testified merely that he endeavored to obtain West's signature to the deposition, but " He refused to sign it." The record discloses none of the circumstances of the frustrated endeavor; neither the reason for West's refusal appears, nor that he was asked it (cf. CPLR, rule 3116, subd. [a]). In the absence of evidently available testimony on these matters, and of any indication that defendant had waived the signature requirement during the course of the litigation, its waiver by the court was premature.

Additional testimony regarding the service of food to the decedent was also received, over objection, from his daughter, Mrs. Burns, and from her husband. Both recounted conversations during the evening of November 3 with an unnamed hospital attendant, whom they sought to identify as West. In one or the other of these conversations the attendant stated that food had been given to the decedent by mistake and that a doctor had come to look at him because he had taken food and was not feeling well. Mrs. Burns' testimony also referred to a statement made to her on November 4 by Dr. Gordon, a staff physician, to the effect that the decedent had taken some food which had caused a dilation of his stomach. None of these statements should have been admitted. The remarks by the attendant, even assuming he was West, formed no part of the act in issue and no showing of his authority to make them to the witnesses was made (*Schner* v. *Simpson,* 286 App. Div. 716; Richardson, Evidence [8th ed.], § 329, p. 298; 2 Restatement, Agency 2d, § 288). The record indicates that Dr. Gordon was the physician or one of the physicians treating the decedent and, had he been in the employ of the hospital, it might be argued that his authority

included the imparting of medical information to patients' families in the instant circumstances (cf. *Davison* v. *Long Is. Home,* 243 App. Div. 791, with *Piccarreto* v. *Rochester Gen. Hosp.,* 279 App. Div. 625). But proof of such employment is absent.

We see no need to pass on the other points which the parties have tendered.

The judgment should be reversed and a new trial granted, with costs to abide the event.

RABIN, VALENTE and EAGER, JJ., concur with BOTEIN, P. J.; BREITEL, J., concurs in the result solely with respect to granting a new trial on the ground that the verdict is against the weight of the credible evidence.

Judgment unanimously reversed upon the law, the facts and in the exercise of discretion, and a new trial granted, with costs to abide the event.